[Cite as *State v. Johnson*, 2019-Ohio-4733.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS. 2019-A-0013** **2019-A-0014** |
| DENNIS RAY JOHNSON a.k.a. DENNIS RAY JOHNSON, JR., | : | |
| | : | |
| Defendant-Appellant. | | |

Criminal Appeals from the Ashtabula County Court of Common Pleas.
Case Nos. 2018 CR 00308 & 2018 CR 00309.

Judgment: Affirmed.


*Nicholas A. Iarocci*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092 (For Plaintiff-Appellee).

*Eric D. Hall*, P.O. Box 232, Medina, OH 44258 (For Defendant-Appellant).


TIMOTHY P. CANNON, J.

{¶1}     Appellant, Dennis Ray Johnson (a.k.a. Dennis Ray Johnson, Jr.), appeals from two sentencing entries issued by the Ashtabula County Court of Common Pleas on January 4, 2019.  Appellant argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  The convictions are affirmed.

**Procedural History**

{¶2}   On May 16, 2018, in case number 2018 CR 00308, appellant was indicted on two counts of Felonious Assault (F2) in violation of R.C. 2903.11(A)(2); one count of Domestic Violence (F3) in violation of R.C. 2919.25(A)&(D)(4); and one count of Aggravated Menacing (M1), in violation of R.C. 2903.21(A).  On June 27, 2018, in case number 2018 CR 00309, appellant was indicted on one count of Aggravated Possession of Drugs (F5) in violation of R.C. 2925.11(A)&(C)(1)(a); and one count of Possessing Criminal Tools (F5) in violation of R.C. 2923.24(A).

{¶3}   The charges stemmed from the investigation of an assault that allegedly occurred on or about the morning of April 19, 2018.  The victim, a female adult referred to as J.G. herein, accused appellant of assaulting her at gun and knife point at his home in Ashtabula, Ohio, where she had spent the night with him.  An arrest warrant for appellant and a search warrant for his home were executed by members of the Ashtabula Police Department and the Ashtabula Regional SWAT Team.  Appellant failed to comply with several verbal commands to exit the home, which led to the release of chemical munitions.  Appellant eventually exited and was arrested.  The following items were collected from the home as evidence: a digital scale with white powder residue; a glass plate with drug residue (later found to contain trace amounts of methamphetamine); a receipt book described as a drug ledger; drug paraphernalia; check weights; 16 white oblong pills rolled into a bag; a DVR and security cameras; shotgun shells; and seven BB guns of various makes and models, including a BB revolver with ammunition.

{¶4} The indictments were joined for trial. The jury returned not guilty verdicts on both Felonious Assault charges. The jury found appellant guilty of Domestic Violence, Aggravated Menacing, Aggravated Possession of Drugs, and Possessing Criminal Tools.

{¶5} On January 4, 2019, the trial court sentenced appellant as follows: 36 months for Domestic Violence, 6 months for Aggravated Menacing, 12 months for Aggravated Possession of Drugs, and 12 months for Possessing Criminal Tools. The sentences were ordered to be served concurrently for a total of 36 months imprisonment.

{¶6} Appellant noticed an appeal from each sentencing entry, which have been consolidated for review. He does not challenge his conviction for Aggravated Menacing. With regard to the other three convictions, appellant raises two assignments of error:

> [1.] The evidence was insufficient to support the jury's verdict of guilty as to domestic violence, aggravated possession of drugs, and possessing criminal tools.
>
> [2.] Appellant's convictions as to domestic violence, aggravated possession of drugs, and possessing criminal tools were against the manifest weight of the evidence.

{¶7} We consider appellant's assignments of error in a consolidated fashion. Appellant argues the evidence was insufficient to support his convictions for Domestic Violence, Aggravated Possession of Drugs, and Possessing Criminal Tools. He further argues his convictions were against the manifest weight of the evidence.

**Standards of Review**

{¶8} When reviewing whether sufficient evidence was presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d

3

259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979). Thus, a claim of insufficient evidence invokes a question of due process, the resolution of which does not allow for a weighing of the evidence. *State v. Habo*, 11th Dist. Portage No. 2012-P-0056, 2013-Ohio-2142, ¶14.

{¶9} To determine whether a verdict is against the manifest weight of the evidence, a reviewing court must consider the weight of the evidence, including the credibility of the witnesses and all reasonable inferences, to determine whether the jury "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*, *supra*, at 175.

**Domestic Violence**

{¶10} In order to prove appellant committed Domestic Violence, the State had to prove beyond a reasonable doubt that appellant knowingly caused or attempted to cause physical harm to a family or household member. R.C. 2919.25(A). The parties stipulated that appellant had previously pleaded guilty to or was convicted of two or more violations or offenses of Domestic Violence as set forth in the indictment. R.C. 2919.25(D)(4).

<u>The Victim's Testimony</u>

{¶11} J.G. testified that she met appellant in 2008. They had been engaged and had lived together in the past. Appellant and J.G. dated off and on for several years; they were dating at the time of the incident in April 2018. Sometimes J.G. stayed with appellant

4

and kept some of her personal belongings at his residence. They intended to live together again. On April 19, 2018, J.G. went to appellant's home to clean. They slept in the bedroom together that night.

{¶12} Appellant woke J.G. around 1:00 or 2:00 a.m. to say her phone was "going off." J.G. told appellant it was his daughter messaging her, which made appellant angry. Appellant began yelling and demanded that J.G. delete Facebook messenger, which she refused to do. He threw money at J.G. and asked how much it would cost for her to perform oral sex. Appellant then began to choke J.G. while she was lying in the bed. He told her she was going to die a slow death that night and held her down with his knee on her chest. Appellant then stopped choking J.G., began yelling, and grabbed a knife from the dresser. Appellant told J.G. he was going to cut her up into pieces and no one would find her.

{¶13} Appellant then retrieved a gun from another dresser and told J.G. he was going to end it all. He removed all of the bullets from the gun except for one, spun the chamber, put the gun to his head, said "I'm going to end this," and pulled the trigger. Appellant repeated this a few more times then got on his knees in front of J.G. and told her to pick up the gun. When she refused, appellant became angry and pointed the gun at her face. Appellant pulled the trigger three or four times. J.G. believed she was going to die. Although it was later determined that the gun was a nonfunctioning "BB gun," J.G. believed at the time that it was a real gun.

{¶14} Appellant struck J.G. with the gun on the top and back of her head multiple times, causing injury. She thought her head was going to "gash open." Appellant threatened to shoot her kneecaps and said he was going to call J.G.'s father to make her

5

beg for mercy. Appellant threw the phone at J.G., hitting her in the face and arm, causing bruises to her elbow.

{¶15} Appellant then stopped abruptly and went downstairs. J.G. stayed in the bed, afraid to move. When appellant returned to the bedroom, he told J.G. he wished she had called the police so that he could have a "shoot out" with them. Appellant eventually laid down and fell asleep. J.G. remained in the bed, afraid that if she moved, he would begin to attack her again. J.G. finally fell asleep.

{¶16} J.G. awoke the next morning before appellant. As she prepared to leave the house, appellant asked what she was doing and if she was coming back. J.G. told him she was going to pick up her daughter from a medical appointment and that she was coming back. She was afraid to say otherwise. Appellant gave J.G. his keys.

{¶17} After discussing the night's events with her daughter, J.G. decided to go to the hospital. J.G. called the hospital first to say she was coming in, because she was afraid appellant would find her if she had to wait in the waiting room. When she arrived, J.G. asked hospital personnel to call the police. An examination revealed multiple bruises, bite marks and red marks on her neck, and lumps on the top and back of her head. She did not have any medical reports from the hospital at trial.

{¶18} J.G. was transported to the police station where she gave a statement. While there, appellant attempted to contact her by phone call and text message. J.G. eventually answered and said that her daughter was in the hospital. Appellant began to yell that he wanted his keys back, but J.G. said she was not leaving.

{¶19} After giving her statement, an officer took J.G. to her daughter's home. She then picked up her car and went to her father's house.

6

**{¶20}** Appellant later contacted J.G. from a different phone number. Appellant told her he was in jail because she had lied and that she needed to "straighten that out."

<u>The Officers' Testimony</u>

**{¶21}** Lieutenant Daniel Gillespie responded to J.G.'s domestic violence report at the emergency room. He observed red marks around her neck and that she was visibly upset. J.G. was also complaining of an injury to the back of her head. Lt. Gillespie photographed her injuries. J.G. showed the lieutenant her phone, and he took photographs of the messages from appellant's daughter that precipitated the assault. J.G. stated she wanted to pursue charges against appellant, and Lt. Gillespie transported her to the police station.

**{¶22}** Detective Michael Polinkas testified that during J.G.'s interview at the police station, she appeared fearful and scared from the altercation that occurred the night before. She was also visibly upset and scared when appellant was repeatedly calling her phone. Appellant sounded angry when J.G. answered the phone. The detective observed injuries to J.G.'s neck and the messages on her phone from appellant's daughter.

**{¶23}** Detective Douglas Hollis responded to appellant's residence, along with other members of the Ashtabula Regional SWAT Team and the Ashtabula Police Department, to effectuate the arrest and search warrants. When appellant did not respond to the officers' commands to exit, chemical munitions were projected into the house. Appellant let his dog out of the house and began taunting the officers, but he still refused to exit. The officers continued with the chemical munitions until appellant finally exited and surrendered.

{¶24} Upon searching appellant's residence, Det. Hollis located a BB gun in the kitchen. He described the BB gun as a "facsimile firearm," i.e., "It's a BB gun but it looked very, very real." When the detective first observed the BB gun, he believed it was a real firearm. He also located a bag of shotgun shells in a kitchen cupboard, although no real guns were located in appellant's residence.

{¶25} Detective Polinkas also participated in the search of appellant's residence. A security system DVR was seized from the living room. Multiple BB guns were located in the home that had the feel, weight, and/or appearance of real guns. One had an inscription of "Big Honky," appellant's nickname. One was located on a dresser in appellant's bedroom. The officers never located a $CO_2$ cartridge for the BB guns, which Det. Polinkas testified is necessary for BB guns to dispel a projectile.

### Appellant's Testimony

{¶26} Appellant testified that his relationship with J.G. had ended in October 2015, but they occasionally saw each other after that. A few weeks before the night in question, they had been seeing each other more frequently and decided to move in together. At the time, they were also both seeing other people.

{¶27} Appellant testified that J.G. took him to the emergency room on the evening of April 18, 2018, where he was treated for kidney stones. He was released around midnight and left with J.G. He was given pain medication at the hospital, Percocet and Dilaudid, that made him "pass out." The couple attempted to have sex, but appellant was too heavily medicated. J.G. woke him up in the morning to give him a pain pill and made him breakfast. J.G. told appellant she had to take her daughter to dialysis. When she left, he "passed out" again. Appellant said he did not give her his keys. When he woke

8

up later that afternoon, he discovered his keys were missing. Appellant began calling J.G.'s phone in order to locate his keys so that he could make a 4:00 p.m. probation appointment.

{¶28} According to appellant, he did not realize the SWAT team was at his residence until he saw his dog running back and forth. He was listening to music through headphones and playing video games, so he did not hear their initial command to come outside. Appellant thought J.G. had come home, but then he realized it was the police. He did not know why they were there. Appellant stated he tried to surrender, but a gas cannister came through his front door and shot him in the face, knocking him to the floor.

{¶29} Appellant also testified about the revolver style BB gun that J.G. accused him of using during the assault. He stated the BB gun was not functional because he did not have a $CO_2$ cartridge, which is required to fire the BB gun. He denied everything J.G. had accused him of—he said he never held the BB gun to his head, pulled the trigger, hit J.G. in the head with the BB gun or the phone, held a knife to her throat, or choked her. Instead, he testified that J.G. consented to the activity that left the red marks on her neck, that she liked being choked and bitten during sex. Appellant stated J.G. made the accusations because he was seeing another woman and because she did not want appellant to expose her own infidelity.

**Aggravated Possession of Drugs and Possessing Criminal Tools**

{¶30} In order to prove appellant committed Aggravated Possession of Drugs, the State had to prove beyond a reasonable doubt that appellant knowingly obtained, possessed, or used a controlled substance—specifically, a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana,

9

cocaine, L.S.D., heroin, any fentanyl-related compound, or hashish—or a controlled substance analog. R.C. 2925.11(A) & (C)(1).

{¶31} In order to prove appellant Possessed Criminal Tools, the State had to prove beyond a reasonable doubt that appellant possessed or had under his control any substance, device, instrument, or article, with purpose to use it criminally. R.C. 2923.24(A).

### The Officers' Testimony

{¶32} During the search of appellant's residence, in the spare bedroom, Detective Polinkas observed a 100-gram check weight and a glass plate engraved with appellant's nickname, "Big Honky." There was a razor blade and drug residue on the plate, which BCI later confirmed was methamphetamine. The officers also seized plastic "sandwich baggies" and a cut straw, which are consistent with the packaging and ingestion of methamphetamine.

{¶33} More check weights were discovered in the mud room. The officers also located a digital scale, the tray of which contained a white powder residue, and a bag containing 16 white oblong pills. The scale suggested trafficking of narcotics.

{¶34} Finally, in appellant's bedroom, the detective observed a metal tin, which contained a receipt book. The detective testified that, in his experience, the writing in the receipt book documented prices and amounts of drug activity.

### Appellant's Testimony

{¶35} Appellant denied possessing methamphetamine. He testified that the items found with methamphetamine residue did not belong to him and that many items in his

home had belonged to his deceased father. He admitted the scale was his, which he testified can be purchased at a post office.

## Conclusion

{¶36} Upon review of the evidence outlined above, we conclude there was not only sufficient, but abundant, evidence to support appellant's convictions of Domestic Violence, Aggravated Possession of Drugs, and Possessing Criminal Tools.

{¶37} Further, we do not conclude that the jury lost its way or created a manifest miscarriage of justice by finding appellant guilty. Appellant asserts J.G. had motive to fabricate her accusations, was unable to remember details of her hospital encounter, and gave conflicting testimony. However, the prosecution's evidence that appellant choked, beat, and threatened to kill J.G. clearly outweighed appellant's testimony that she lied to the police because either she or appellant, or both, were dating other people. And the evidence that appellant possessed methamphetamine and criminal tools in his residence, including residue found on a plate with an engraving of appellant's nickname, outweighed appellant's testimony that those items belonged to his deceased father. The convictions are not against the manifest weight of the evidence.

{¶38} Appellant's first and second assignments of error are without merit.

{¶39} The judgments of the Ashtabula County Court of Common Pleas are affirmed.


CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.


11